IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **National Center for Public Policy Research** ) | |
| ) | Case No. _____ |
| **Plaintiff.** ) | |
| ) | |
| -against- ) | |
| ) | |
| ) | |
| **UNITED AIRLINES HOLDINGS, INC.,** ) | |
| **Defendant.** ) | |
| ) | |

**COMPLAINT FOR INSPECTION OF BOOKS AND RECORDS**
**(Pursuant to 805 ILCS 5/7.75)**

**NATURE OF THE ACTION**

1. This is an action brought under 805 ILCS 5/7.75, the Illinois Business Corporation Act, to compel inspection of corporate books and records of United Airlines Holdings, Inc. ("United" or the "Company") by Plaintiff National Center for Public Policy Research, a shareholder.

2. Plaintiff seeks inspection for the proper purpose of investigating potential breaches of fiduciary duty, corporate mismanagement, and undue influence by internal labor unions in connection with the Company's recent decisions, specifically the suspension and subsequent substantial reduction of its air service to Tel Aviv, Israel, despite the significant financial harm this decision has caused to the Company and its shareholders.

3. Plaintiff also seeks to inspect possible violations of federal and Illinois state securities laws, arising from the Company's failure to disclose material information and the impact of external political pressures on corporate decision-making and performance.

4. These decisions, made without clear explanation of all factors contributing to such decision, and without sufficient disclosure of all material considerations, appear to have caused significant financial harm to the Company and its shareholders, raising legitimate concerns regarding whether the actions were in the best interest of the Company or whether they were improperly influenced by either (i) internal pressure unrelated to any financial consideration, or (ii) by the personal political beliefs of management and the Board—in violation of United's fiduciary duties of care and loyalty.

5. Plaintiff further seeks to investigate whether United Airlines has engaged in unlawful collusion with other national or international carriers, including Turkish Airlines, to restrict flight access to Israel. Turkish Airlines, a key Star Alliance partner of United, is partially controlled by the Turkish government, which has publicly called for and engages in a boycott of Israel.

**JURISDICTION AND VENUE**

6. This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a) as the matter in controversy exceeds $75,000 and is between citizens of different states.

7. Venue is proper in this District under 28 U.S.C. § 1391(b) because United maintains its corporate headquarters in Chicago, Illinois.

8. United maintains a forum selection clause purporting to require that internal affairs disputes be litigated in Delaware. However, Plaintiff brings this action pursuant to Section 7.75 of the Illinois Business Corporation Act ("Section 805 ILCS 5/7.75"), which expressly authorizes shareholders to inspect the books and records of corporations, including foreign corporations authorized to transact business in Illinois. This statutory right may be enforced in Illinois courts and operates irrespective of any corporate forum selection

2

clause, reflecting Illinois' strong public policy in favor of corporate transparency and shareholder oversight.

9. Section 805 ILCS 5/13.10 further provides that foreign corporations authorized to transact business in Illinois are subject to the same duties, restrictions, and liabilities as domestic corporations, including compliance with shareholder inspection obligations under Section 805 ILCS 5/7.75. Therefore, foreign corporations like United—incorporated in Delaware but maintaining its principal executive offices and operational decision-making in Illinois—are fully subject to Illinois inspection rights statutes when doing business in the state.

10. Plaintiff acquired shares in United before Delaware enacted major amendments to Section 220 of the Delaware General Corporation Law (8 Del. C. § 220), signed into law on March 25, 2025. These changes significantly narrowed stockholder inspection rights, curtailed judicial discretion, and limited access to internal communications—substantially reducing shareholders' ability to investigate potential misconduct.

11. While Delaware has a right to seek to shield corporations domiciled within its jurisdiction from certain transparency requirements, such efforts do not override the authority of the State of Illinois to regulate corporations that are residents of Illinois and subject to its laws. Illinois maintains a compelling interest in protecting the rights of shareholders through appropriate and reasonable regulatory measures.

**PARTIES**

12. Plaintiff National Center for Public Policy Research is a shareholder of United Airlines Holdings, Inc. and has been a shareholder at all relevant times, since at least August 2, 2024.

13. Defendant United Airlines Holdings, Inc. is a Delaware corporation with its principal executive offices located at 233 S. Wacker Drive, Chicago, Illinois 60606.

**FACTUAL BACKGROUND**

14. Plaintiff is the beneficial owner of 123 shares of United Airlines Holdings, Inc.

15. On October 7, 2023, United suspended its flights to Tel Aviv, citing safety concerns. While this initial suspension may have appeared outwardly justifiable, United failed to fully restore service even after major ceasefire agreements were reached on November 27, 2024 (Israel–Lebanon) and January 19, 2025 (Israel–Hamas).

16. Before October 2023, United operated 28 weekly flights to Tel Aviv. As of April 2025, United has resumed only 14 weekly flights—a 50% reduction. United's own 8-K filings and quarterly earnings reports confirm that this suspension resulted in a material decline in earnings, including an estimated $0.15 per share in lost EPS for each month of suspended operations **(Exhibit A)**.

17. Despite these adverse financial impacts, United did not disclose the role of union influence in its public filings. Statements by the Association of Flight Attendants-CWA (AFA-CWA) and media reports indicate that the flight attendants' union exerted internal political pressure to prevent resumption of the Tel Aviv route for ideological, not safety, reasons.

18. To the extent United's decision-making was influenced by internal or external political pressure or ideological considerations unrelated to shareholder value, any capitulation by the Company's directors or officers constitutes a breach of their fiduciary duties. Subordinating the financial interests of shareholders to non-financial or political motives violates the duties of care and loyalty owed to the corporation and its investors.

19. In seeking to understand the factors that may have influenced a decision by United that harmed its shareholders, Plaintiff is not merely second-guessing a corporate decision but rather acting upon information and reports, including from members of Congress, that United's decision to suspend flights to Tel Aviv were based, substantially, upon improper considerations violative of shareholders' rights and counter to their best interests.

20. Peer airlines, including several major international carriers, resumed service to Tel Aviv well before United Airlines reinstated its own operations on March 15, 2025. The Lufthansa Group resumed flights on February 1, 2025, through all its subsidiaries—including Swiss International Air Lines, Austrian Airlines, Brussels Airlines, and Eurowings. Air France also resumed flights to Tel Aviv in early 2025. In contrast, United failed to provide shareholders with a clear explanation or any disclosed risk assessment regarding its prolonged suspension. Notably, El Al Israel Airlines maintained uninterrupted service to Tel Aviv throughout the entire conflict period.

21. At no point during the relevant period did any U.S. federal agency—including the Federal Aviation Administration ("FAA") or the U.S. Department of State—issue a directive, order, or formal reassessment indicating that commercial flights to Tel Aviv posed an undue safety risk or should be suspended.

22. Upon information and belief, internal labor unions and politically motivated pressure unduly influenced the decision to terminate flights to Tel Aviv, overriding objective business considerations and compromising shareholder value.

23. This decision has contributed to material harm to United's international market share and financial performance in the Middle East market.

5

24. United's 2023 Annual Report (Form 10-K) **(Exhibit B)** confirms that the suspension of flights to Israel significantly impacted its financial condition, cash flows, and operations. These financial indicators, combined with United's public filings and contemporaneous market reaction, confirm that Plaintiff's demand is not speculative. Rather, it reflects an effort to evaluate corporate governance in light of quantifiable financial losses tied to potentially improper decision-making.

25. This concern is echoed by public officials. Members of Congress, including Rep. Ritchie Torres (D-NY) and Sen. Ted Cruz (R-TX), criticized the suspension. Torres described the situation as an "effective boycott" more damaging than anything achieved by the formal Boycott Divestment and Sanctions (BDS) movement, and suggested that political motivations were overriding safety or commercial logic. Senator Cruz similarly noted that U.S. companies may have bowed to union and activist pressure and warned that politically motivated boycotts of Israel may violate U.S. anti-boycott laws.

26. Plaintiff submitted a written demand to inspect corporate books and records pursuant to 805 ILCS 5/7.75 on April 28, 2024 **(Exhibit C)**, seeking records including but not limited to:

    a. Board and committee meeting minutes related to service to Israel;

    b. Communications among directors, officers, and labor unions concerning flight service to Tel Aviv;

    c. Internal risk assessments and financial projections regarding the Tel Aviv route;

    d. Any union correspondence or documentation referencing political or operational influence over route decisions.

27. Defendant has refused and failed to comply with the demand **(Exhibit D)**.

**PROPER PURPOSE**

28. Plaintiff seeks to inspect United's books and records for the following purposes:

• To investigate possible mismanagement and breaches of fiduciary duty;

• To evaluate whether political or labor union influence improperly affected corporate decision-making;

• To assess the financial harm caused by the suspension and reduction of Tel Aviv flights; and

• To determine whether derivative litigation or other remedial action is warranted.

29. In the absence of any flight ban from the FAA, and in light of other airlines flying safely, as well as the presence of a ceasefire— Plaintiff has articulated a clear and specific concern, based upon information available to the public, that United's continued suspension of flights to Tel Aviv was driven not by operational risk but by political and ideological pressure from the AFA-CWA, whose leadership has publicly aligned with anti-Zionist BDS-style rhetoric.

30. United's suspension persisted long after other international carriers resumed operations to Israel.

31. Association of Flight Attendants-CWA ("AFA-CWA") President Sara Nelson has made a series of public statements urging political action against Israel and aligning her union with pro- BDS and ceasefire movements. Nelson publicly condemned arrests of pro-Hamas student protesters at Columbia University as reminiscent of the Kent State shootings and called for a halt to U.S. military aid to Israel. This is despite the fact that Hamas has been designated as a Foreign Terrorist Organization by the Department of State since 1997. She was also instrumental in forming the National Labor Network for Ceasefire and advocating for anti-Israel positions under the guise of employee safety.

32. Nelson also played an active leadership role at the "Hot Labor Summer Launch" event at Columbia University, where she trained and coordinated with students affiliated with the

BDS movement and Students for Justice in Palestine (SJP) on organizing protests and walkouts. The event, organized by Columbia University Apartheid Divest (CUAD), brought together over 80 student organizations aligned with anti-Israel activism. Nelson's participation highlights her hands-on involvement in shaping Columbia University protest strategy in collaboration with ideologically motivated groups.

33. Nelson's presence alongside BDS co-founder Omar Barghouti, author of *Boycott, Divestment, Sanctions, The Global Struggle for Palestinian Rights*, and Teamsters organizer Tony Rosario illustrates the ideological alignment between national union leadership and anti-Israel anti-corporate political activist networks, which further supports the inference that the AFA-CWA's influence extended beyond labor representation into broader political activism impacting United's corporate decisions, with Nelson effectively practicing what she preached.

34. "Red Hot Summer Launch" is the Young Democratic Socialists of America (YDSA)'s national labor organizing campaign, launched in collaboration with major union leaders (including Sara Nelson), designed to mobilize student and young worker support for broader socialist labor goals. The "Power in Palestine" program was rolled out as part of this curriculum—promoting divestment, and teaching disruption tactics, and anti-Israel activism under the labor-left umbrella.

35. Sara Nelson was a featured prominent leader and participant at events from the start of the program in 2022—well before the onset of the current conflict in Israel—demonstrating her longstanding alignment with activist circles advancing BDS-aligned objectives - and continued following the conflict in the fall and summer of 2023.

36. The training program "Power in Palestine" was explicitly designed to develop long-term divestment strategies targeting institutions and corporations with perceived ties to Israel. The

8

training reflects a broader, organized campaign to escalate anti-Israel activism across the United States, particularly on college campuses and in institutional governance. The program included detailed sessions on political pressure tactics, disruption of university operations, corporate targeting, and the radicalization of student activists.

37. Entities and individuals discovered to have connections to Israel were designated as "targets" for divestment and public pressure.

38. This year, the program plans for future national-level actions, including economic boycotts against companies like Chevrolet for alleged ties to Israel, and a planned march on the Chicago DNC office in August 2025.

39. By embedding BDS advocacy within a labor organizing framework, Sara Nelson helped YDSA legitimize and mainstream its anti-Israel agenda by tying it to the broader appeal of labor solidarity, particularly in universities and progressive unions. This strategy further helped shield radical content (like calling for the dismantling of Israel or teaching illegal disruption tactics) under the labor and social justice banner to the point that labor unions have become a trojan horse for BDS activists.

40. These activities reflect a growing and highly coordinated ideological movement exerting pressure on public institutions, corporations, and labor organizations to adopt anti-Israel positions. Such pressure creates a climate in which politically motivated decisions—such as the suspension of air service to Tel Aviv—occur without clear financial or operational justification. Plaintiff includes this background to highlight the broader context of ideological campaigns that animate United's labor unions which shareholders, who have suffered losses as a result of United's suspension of service of Tel Aviv, have a right to investigate through corporate books and records.

41. In fact, the AFA-CWA and similar unions have engaged in comparable campaigns across multiple public companies in the United States, urging boards to adopt policies aligned with anti-Israel activist or geopolitical positions rather than core business or shareholder interests. This broader pattern of union activism, combined with United's economically harmful decision-making and Congressional accusations of boycott activity, raises legitimate concerns that United's leadership have prioritized political appeasement over fiduciary obligations.

42. Upon information and belief, beginning in or around October 2023, the AFA-CWA, together with allied labor organizations including the American Postal Workers Union ("APWU"), International Union of Painters and Allied Trades ("IUPAT"), National Education Association ("NEA"), National Nurses United ("NNU"), United Auto Workers ("UAW"), and United Electrical Workers ("UE"), engaged in a coordinated campaign to pressure public companies to adopt policies aligned with anti-Israel activist positions rather than core business interests or shareholder value.

43. For example, the NEA and UAW have endorsed BDS resolutions, pushing educational institutions and manufacturing companies to sever business ties with Israeli entities. Through these actions—leveraging pension fund investments, shareholder voting power, public campaigns, and direct lobbying—these unions have subordinated fiduciary responsibilities to shareholders and traditional business considerations in favor of advancing political and ideological objectives tied to the Israeli-Palestinian conflict. Such conduct has materially interfered with corporate governance, jeopardized shareholder value, and exposed companies to heightened operational, reputational, and legal risks. These actions constitute a deviation from the unions' traditional role in advocating for workplace conditions and wages and represent a broader pattern of

ideological activism among certain unions subordinating business considerations to anti-Israel political objectives.

44. Upon information and belief, behind the scenes, the AFA-CWA, led by the influential Sara Nelson, has consistently applied significant pressure on United's management to isolate Israel economically and diplomatically.

45. Upon information and belief, United Airlines' February 4, 2025, public statement announcing the resumption of its Tel Aviv route represents a sharp and troubling departure from the company's longstanding practice of attributing route suspensions and resumptions exclusively to operational, commercial, or safety considerations.

46. In an unprecedented move, United stated that the decision "follows a detailed assessment of operational considerations for the region and close work with the unions who represent our flight attendants and pilots." This marked the first time United has publicly acknowledged union input as a determinative factor in the resumption of international flight operations.

47. This explicit mention of union involvement in decisions about international flight operations is unprecedented in United's public communications. Typically, airlines attribute such decisions to factors like safety, commercial viability, or regulatory considerations. The inclusion of unions in this context suggests an unusually high degree of influence or involvement in what is normally a management-level strategic or safety decision.

48. Upon information and belief, no similar statements from United or other major U.S. airlines have been identified in prior announcements concerning route suspensions or resumptions. This departure from standard corporate messaging indicates a significant shift in how United communicates about its operational decisions.

11

49. This public acknowledgment of union influence introduces a previously undisclosed element of internal political and ideological pressure into United's operational decision-making framework—an element that had not been shared with shareholders, regulators, or the market. United's failure to disclose the material role of union influence in its decision-making process, particularly with respect to international operations in politically sensitive regions, rendered its prior disclosures incomplete and misleading.

50. By omitting any reference to union influence in its earlier communications regarding the suspension of the Tel Aviv route, and only later acknowledging that such influence played a central role in the decision to resume service, United misled shareholders regarding the true nature of its risk assessment and governance process. This selective disclosure misrepresented the consistency and neutrality of United's operational decision-making, in violation of its duty to provide accurate and complete information to investors.

51. Within days of the October 7 terrorist attacks, AFA-CWA leadership began organizing meetings and issuing statements emphasizing the need for United to halt flights to Israel as part of their broader political agenda (irrespective of safety or business concerns).

52. The AFA-CWA has actively participated in the following initiatives:

- Formation of the National Labor Network for Ceasefire (NLNC): AFA-CWA joined forces with other national unions to establish the NLNC, aiming to expand support for a ceasefire among unions nationwide. [1]

- Advocacy for Ending U.S. Military Aid to Israel: Alongside six other national unions, AFA-CWA signed a letter addressed to President Biden, urging an immediate halt to all

---

[1] The National Labor Network for Ceasefire was formed in collaboration with international labor unions and solidarity movements, and in response to Palestinian labor unions' requests, asking for increased pressure on governments and corporations involved in the Israeli-Palestinian conflict. The main goal is to engage with global workers' movements that seek to put pressure on Israel through boycotts, divestment, and sanctions (BDS). The Palestinian Labor Union in Gaza operates under Hamas's authority and is required to coordinate with Hamas for access to workplaces, government entities, and humanitarian aid.

military aid to Israel. This unprecedented demand reflects a coordinated effort among major labor organizations to influence U.S. foreign policy.

- Public Statements and Resolutions: AFA-CWA has been part of broader labor movements calling for a ceasefire and reassessment of U.S. support to Israel, aligning with resolutions passed by other unions.

53. Labor unions, including the AFA-CWA under the leadership of Sara Nelson, have been identified as platforms advancing these goals. Union leaders sympathetic to the alliance have consistently applied pressure on employers to make operational decisions, such as suspending flights to Israel, under the guise of safety or ethical considerations while advancing ideological objectives.

54. Nelson is also closely aligned with Shawn Fain, President of the United Auto Workers union ("UAW") which publicly released a statement calling for a ceasefire in Gaza. The statement did not condemn Hamas's October 7th attack and focused primarily on Palestinian suffering and referenced "end[ing] the occupation and apartheid."

55. In December 2023, Nelson and Fain aligned publicly in support of a ceasefire in Gaza. Fain's public advocacy has not been without controversy: Fain's ceasefire stance led to scrutiny from a federally appointed monitor overseeing the UAW, who raised concerns about the union's position on the Gaza conflict.

56. Nelson not only publicly endorsed this call but also helped launch the National Labor Network for Ceasefire, a coalition of national unions advocating for a ceasefire in the Middle East, with no regard for Israel's safety or security, in early 2024, which both AFA-CWA and UAW joined.

57. Under Sara Nelson's leadership, AFA-CWA:

• Issued statements of solidarity with student protestors, defending their right to organize and criticizing political crackdowns on pro-Hamas expression

13

• Participated in YDSA's Red Hot Summer alongside BDS advocates, including Omar Barghouti, and student organizers from Columbia and Barnard.[2]

• Emphasized that "saving lives comes first" and that "nothing else is possible without the security of peace," echoing the language of Palestinian trade unions and ignoring the reasons why there was no peace.

58. Upon information and belief, Sara Nelson was one of the organizers and speakers at the Red Hot Summer launch. The event brought together a powerful coalition of student-led and grassroots groups, including EWOC (Emergency Workplace Organizing Committee), RFP (Rank-and-File Project), DSA (Democratic Socialists of America)'s BDS Working Group, Palestine Solidarity Working Group, NSJP (National Students for Justice in Palestine), PYM (Palestinian Youth Movement), and student leaders from Columbia, Barnard, and other universities.

59. The collaboration between union leadership and radical activist groups underscores a broader ideological alignment that has begun to surface within labor circles, including AFA-CWA. Such alignment is not merely rhetorical; it has translated into tangible consequences, as evidenced by litigation filed in other jurisdictions against airline personnel and union representatives, alleging antisemitic harassment and hostile work environments within flight attendant unions like AFA-CWA. These legal actions underscore the seriousness of the ideological climate within labor organizations and the plausible impact such dynamics may have on corporate governance and decision-making at United.

60. The influence of union leadership, beholden to anti-Israel activists, over operational decisions, raises a credible basis to suspect mismanagement or a breach of fiduciary duty, particularly when these decisions contradicted established FAA guidance. Notably, the FAA did not

---

[2] The YDSA have actively incorporated BDS principles into their programming, aiming to educate members on the movement's goals and strategies, and to encourage active participation in BDS campaigns. A significant component of this effort is the Red Hot Summer initiative, designed to train young activists in various aspects of organizing, including international solidarity efforts like BDS.

prohibit U.S. airlines from flying to Tel Aviv. This fact was confirmed in contemporaneous coverage and regulatory guidance. Despite this, United failed to resume service, while competitors like El Al capitalized on elevated demand, posting record profits.

61. In addition to internal union pressures, Plaintiff also has reason to investigate whether external international alliances may have influenced United's refusal to resume Tel Aviv service. Plaintiff seeks to investigate whether United Airlines has engaged in unlawful collusion with other major national or international carriers, including Turkish Airlines, to suppress or restrict flight options to Israel. Turkish Airlines, a member of the Star Alliance global network of which United Airlines is a founding member, is partially owned and effectively controlled by the government of Turkey. That government, under the leadership of President Recep Tayyip Erdoğan, has publicly called for a boycott of Israel and has implemented policies consistent with such a boycott. Turkish Airlines has been subject to scrutiny for adhering to Turkey's broader boycott policies, including restrictions on commercial dealings with U.S. companies operating in or supporting Israel, raising further concerns about its alignment with politically motivated economic boycotts.

62. Given United Airlines' longstanding and strategic partnership with Turkish Airlines through the Star Alliance, Plaintiff has reason to believe that United may have participated in or failed to oppose coordinated conduct adversely affecting access to Israeli travel routes, in violation of U.S. antitrust and anti-boycott statutes.

63. This suspicion is supported by contemporaneous union statements, market data, and inconsistencies in United's conduct across similarly situated geopolitical regions. The Plaintiff is not acting out of curiosity, nor pursuing a fishing expedition, but instead seeks to examine records relevant to operational decisions that have had material economic consequences.

64. As a result of the continued suspension, United's shareholders have suffered significant financial harm. United lost substantial revenue and market share to competitors. The EPS impact was estimated at $0.15 per month. These material consequences—paired with the absence of an FAA mandate and the presence of ideological union pressure—demonstrate why Plaintiff's request is not speculative but grounded in a legitimate, good faith concern regarding the integrity of the Board's decision-making and transparency to investors.

65. Access to books and records under these circumstances is precisely the type of oversight that Section 7.75 is designed to facilitate, and public policy demands that shareholders be permitted to investigate these serious allegations through access to corporate records to investigate suspected mismanagement or breaches of fiduciary duty, particularly where there is a credible basis to believe that improper influence may have guided corporate decision-making.

66. Plaintiff has articulated a clear and specific concern that United's suspension of flights to Tel Aviv—despite significant market demand and profitability—was not based solely, or even primarily, on safety considerations but was influenced by ideological and political pressure from internal labor unions.

67. United has refused to permit inspection despite Plaintiff's valid written demand. As a corporation doing business in Illinois with its principal executive office located in the state, United is subject to Section 7.75.

## CLAIM FOR RELIEF

### (INSPECTION OF BOOKS AND RECORDS UNDER 805 ILCS 5/7.75)

68. Plaintiffs repeat and reallege each of the foregoing allegations with the same force and effect as if more fully set forth herein.

69. Under 805 ILCS 5/7.75, shareholders have the right to inspect corporate books and records for a proper purpose.

70. Plaintiff's purpose—to investigate potential breaches of fiduciary duty, mismanagement, and improper influence over strategic business decisions—is proper under the statute.

71. Defendant's failure to provide the requested records violates Plaintiff's statutory rights.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court:

(a) Enter an order compelling United Airlines Holdings, Inc. to permit inspection and copying of the books and records identified in Plaintiff's demand letter;

(b) Award Plaintiff its reasonable attorneys' fees and costs incurred in bringing this action;

(c) Grant such other and further relief as the Court deems just and proper.

(d) In order to prevent Defendant from interfering with the proper exercise of plaintiff's rights by burdening Plaintiff with excessive costs in connection with the requested production of books and records, Plaintiff must agree to any production-related costs Defendant claims must be paid by Plaintiff before those costs are incurred.

Dated: May 30, 2025

                                                                 Respectfully submitted,

*/s/ Abra Siegel*
Abra Siegel
National Jewish Advocacy Center, Inc.
3 Times Square, New York, NY 10036
(312) 487-1281
Abra@njaclaw.org

Mark Goldfeder (pro hac vice forthcoming)
Goldfeder, Schlager & Beck, LLLP
666 Harless Place
West Hempstead, NY 11552
(917) 301-8746
mark@gideonlawgroup.com

Anat Beck (pro hac vice forthcoming)
Goldfeder, Schlager & Beck, LLLP
666 Harless Place
West Hempstead, NY 11552
(518) 258-0560
anatalonbeck@yahoo.com

Ben Schlager (pro hac vice forthcoming)
Goldfeder, Schlager & Beck, LLLP
666 Harless Place
West Hempstead, NY 11552
(917) 495-5790
Ben@goldfederterry.com

*Attorneys for Plaintiff National Center for Public Policy Research*